COMMONWEALTH *vs.* CALVIN BELTON.

Suffolk.     January 3, 1967. — March 31, 1967.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, KIRK, & SPIEGEL, JJ.

*Identity. Homicide. Evidence,* Of reputation. *Practice, Criminal,* Argument by prosecutor.

The combined testimony of several witnesses at a murder trial warranted a finding that a man seen on an upper floor of a Young Women's Christian Association building late one evening, at about the time the night watchman was found there mortally stabbed, was the defendant. [266]

Evidence at the trial of an indictment for murder of the night watchman of a Young Women's Christian Association building warranted a finding that the defendant, upon being discovered on an upper floor of the building late one evening, mortally stabbed the watchman in order to avoid apprehension and then fled down the stairs to the basement and out of the building. [266–267]

On the record of a murder trial there was no abuse of discretion in the judge's ruling that there was not sufficient basis for, and excluding, testimony offered by the defendant to show that among his business associates he had a general reputation of being a peaceful and quiet person. [269]

There was no impropriety on the part of the prosecutor at a murder trial in commenting in his closing argument on the fact that important de-

tails of an alibi as presented by the defendant at the trial were not the same as those which he had told to the police. [270]

A remark by the prosecutor in his closing argument at a murder trial, "Now the spirit of . . . [the victim] is hovering over this court room watching to see how well you redeem your juror's oath, watching how well and courageously you perform your duty as jurors," was not so prejudicial as to require reversal of a conviction. [270]

INDICTMENT found and returned on October 5, 1965.

The case was tried in the Superior Court before *Macaulay, J.*

*Walter Jay Skinner* for the defendant.

*Angelo Morello,* Assistant District Attorney (*Paul F. Cavanaugh,* Legal Assistant to the District Attorney, with him), for the Commonwealth.

SPALDING, J.   The defendant was indicted for the murder of Clifford Sheets, the indictment charging murder in the second degree. The jury returned a verdict of guilty. The case, having been tried subject to G. L. c. 278, §§ 33A–33G, comes here on the defendant's appeal.

The evidence was as follows: On August 15, 1965, shortly before midnight, Sheets, the night watchman, was found lying in the corridor of the fourteenth floor of the YWCA building in Boston. He was taken to a hospital where he was pronounced dead upon arrival. The death was determined to have been caused by a stab wound in the abdomen.

Four persons had observed a man in the YWCA building on the day Sheets was stabbed. Deirdre Nolan was walking down the fourteenth floor corridor to the bathroom at approximately 11:30 P.M. when a man appeared in a doorway leading from a stairway. She proceeded to the bathroom, entered a bathing cubicle, and secured the latch on the cubicle door. The man followed her to the bathroom, and she heard the bathroom door creak as she was taking her bath. Alice Deering was leaving her room on the fourteenth floor about the same time when she saw a man. She immediately went back in her room and reported his presence by telephone to the operator on duty at the YWCA switchboard. The operator asked Sheets to investigate the

Commonwealth *v.* Belton.

matter.   Sheets proceeded to the fourteenth floor by elevator at approximately 11:45 P.M.

Miss Nolan, after hearing the bathroom door creak, got out of the bathtub and prepared to return to her room. While walking down the corridor she observed Sheets lying on the floor.   About the same time, Arthur Cotter, an elevator operator at the YWCA, was coming on duty.   While going to the employees' locker room in the basement he observed a man come through a doorway leading from a stairway to the upper stories.   The man "stood there momentarily and took a deep breath and started running" out of the building.   Winifred Harris, the building manager, had observed a man running out of the YWCA Stuart Street entrance at approximately 4:15 P.M. of the same day.   She had seen and talked with the same man in the basement of the building about a week earlier.

At the trial each of the four witnesses testified in regard to the identity of the man they had observed in the YWCA on August 15.   Mrs. Harris positively identified the defendant as the man she had seen.   Miss Nolan testified, "I believe . . . [the defendant] is the man."   Miss Deering testified that the defendant was "built like the same.   He seems to be agile the same way the man behind the door was; but I cannot be sure it is the same one."   Cotter testified, "I thought . . . [the man] was lighter complected. . . . [The defendant] looks something like him but I wouldn't swear to it positively."

The defendant's assignments of error relate to (1) the denial of motions for a directed verdict, (2) rulings on evidence, and (3) certain remarks made by the prosecutor. Other evidence will be set forth hereinafter.

1.   After the Commonwealth had rested and again after all the evidence had been presented, the defendant moved for directed verdicts.[1]   The motions were denied.   The defendant contends that there was insufficient evidence connecting him with the crime.   Assignments Nos. 4, 5, 8 and 9.

---

[1] On each occasion two motions were presented.   One asked that a not guilty verdict be directed to so much of the indictment as charged murder in the second degree; the other asked that a not guilty verdict be directed to so much of the indictment as charged manslaughter.

Two witnesses, as noted, identified the defendant as the man they had seen in the YWCA building on the day of the crime. Mrs. Harris also testified that she had seen the defendant in the basement of the YWCA on a previous occasion. It was brought out in cross-examination that on the morning after Sheets was stabbed Miss Nolan was asked by the police to look through a number of pictures. After having seen approximately 150, she identified one as a picture of the defendant. Later that week, Mrs. Harris was shown a picture of the defendant, and identified him as the man she had seen on two occasions in the YWCA building. The defendant contends that the identification testimony of those two witnesses was substantially weakened by the fact that neither was asked to identify the defendant in a lineup.

Miss Nolan's selection of the defendant's picture from a group of 150 alternatives appears to be at least as effective and fair an identification as selection from a lineup. We need not decide whether, if the Commonwealth had attempted to introduce in evidence Mrs. Harris's identification of the defendant's picture, it would have been admissible. Compare *Palmer* v. *Peyton,* 359 F. 2d 199 (4th Cir.). Neither of the picture identifications was introduced by the Commonwealth. Both witnesses identified the defendant at the trial. These were unshaken by thorough cross-examination. The jury were entitled to give them full weight.

Two other witnesses, Cotter and Miss Deering, testified that the defendant was similar in appearance to the man they had seen in the YWCA building. The combined testimony of the four witnesses was sufficient to entitle the jury to find that the defendant was on the fourteenth floor of the YWCA shortly before midnight on August 15, 1965. *Commonwealth* v. *Cunningham,* 104 Mass. 545, 547. See *Commonwealth* v. *Galvin,* 323 Mass. 205, 214–215.

The jury could also find that the defendant was discovered on the fourteenth floor by Sheets, who had been sent there to investigate, and that to avoid apprehension he stabbed Sheets and then fled down the stairs and out through the basement. The Commonwealth was not re-

quired to present direct evidence that the defendant stabbed Sheets. The evidence tended to show that the defendant had some familiarity with the building; that having been detected in a place where he should not have been, he had a motive to resist Sheets; and that, by fleeing, he was conscious of his guilt. Such circumstances warranted a belief beyond reasonable doubt that he had committed the stabbing. See *Commonwealth* v. *Webster,* 5 Cush. 295, 319; *Commonwealth* v. *Leach,* 156 Mass. 99, 101–102; *Commonwealth* v. *Burke,* 339 Mass. 521, 527. The requisite malice was implicit in the very nature of the act. See *Commonwealth* v. *Webster, supra,* at 304; *Commonwealth* v. *Boyajian,* 344 Mass. 44, 48–49. Nor did the alibi evidence require the verdict to be directed.

2. The defendant's counsel attempted on several occasions to elicit evidence of the defendant's reputation for being a peaceful and quiet person. Testimony relating to such reputation in the community where he resided was allowed. Two witnesses were questioned relative to his reputation at his place of work for being a peaceful and quiet person. Upon the prosecutor's objections, these questions were excluded, and the defendant excepted. Assignment No. 6.

Melvin Stearn was the manager of the furniture store where the defendant was employed. The defence counsel asked: "After having discussed this matter with your co-employees or the employees who worked for you, did . . . [the defendant] have a general reputation in the place he worked . . . for being a quiet and peaceful person?" The question was excluded. It appears from later cross-examination of Stearn that any testimony he might have offered relative to reputation would have been based upon a meeting he held with three employees shortly after the defendant was arrested. At that meeting Stearn asked the three employees "if they knew where he went or what he does or if he had gotten into any trouble before, and if they had any trouble with him when he was working, or if they had any trouble when he was in the customers' houses. . . .

Commonwealth *v.* Belton.

[T]hey said no."[2]

The other witness who was not allowed to testify to the defendant's reputation for being peaceful and quiet was William Rutledge, the driver of the furniture store's delivery truck. Rutledge was asked: "Have you discussed the general reputation of Calvin Belton with co-employees, as to being a peaceful and quiet person?" A. "Yes." Q. "What is . . . [his] general reputation . . . for being a peaceful, quiet person?" The question was excluded. Rutledge was later recalled to the stand and the following colloquy ensued: Q. "Prior to August 15, 1965, did you ever hear the general reputation of Calvin Belton discussed among your co-employees as to being a quiet, peaceful person . . .?" A. "No . . . ." Q. "Now, after September 15th, 1965, did you hear or did you participate in the discussion as to the general reputation of Calvin Belton for being a peaceful, quiet person?" A. "Yes . . . ." Q. "How many people were in the group when you discussed this matter . . .?" A. "About three or four . . . ." Q. "Now, as a result of having discussed the general reputation of Calvin Belton with your co-employees after September 15, 1965, . . . what . . . [was his] general reputation . . . for being a quiet, peaceful person?" This question was also excluded.

The rule is that "the defendant in a criminal case may put in evidence his general good reputation in regard to the elements of character involved in the commission of the crime charged against him, for the purpose of establishing the improbability of his having done the wrong imputed to him." *Commonwealth* v. *Nagle,* 157 Mass. 554. *Commonwealth* v. *Beal,* 314 Mass. 210, 230. *Michelson* v. *United States,* 335 U. S. 469, 476. Wigmore, Evidence (3d ed.) § 1610. Formerly such evidence was restricted to reputation in the community where the accused lived. See *F. W. Stock & Sons* v. *Dellapenna,* 217 Mass. 503; *Commonwealth*

---

[2] Stearn's testimony upon cross-examination that he held a meeting with his employees was made with regard to his knowledge of the defendant's reputation for truth and veracity. Nevertheless, it appears that any testimony he might have given with regard to reputation for being peaceful and quiet would have been based on the same meeting.

v. *Porter,* 237 Mass. 1, 4; *Commonwealth* v. *Baxter,* 267 Mass. 591; McCormick on Evidence, § 158. By reason of G. L. c. 233, § 21A, inserted by St. 1947, c. 410, evidence of the defendant's reputation among those with whom "he has habitually associated in his work or business shall be admissible to the same extent and subject to the same limitations as is evidence of such reputation in a community in which he has resided." Thus the defendant, having been charged with murder, was entitled to put in evidence his reputation among his business associates for being peaceful and quiet.

But whereas evidence of a defendant's general reputation is admissible, evidence in the form of private opinions is not. *Commonwealth* v. *De Vico,* 207 Mass. 251, 253. See *Walker* v. *Moors,* 122 Mass. 501, 504–505; *Michelson* v. *United States,* 335 U. S. 469, 477; *United States* v. *White,* 225 F. Supp. 514, 521–522 (D. D. C.); Wigmore, Evidence (3d ed.) § 1983. This distinction between general reputation and individual opinions often is difficult to determine. And the decisions in this Commonwealth in regard to qualifying witnesses to give reputation testimony are not easy to reconcile. Reputation, in its legal sense, is somewhat of a word of art. Not all witnesses can be expected to know what is being asked for, even if they are required to answer affirmatively the one preliminary question which is allowed by *Wetherbee* v. *Norris,* 103 Mass. 565, 566–567. We think that the judge should be permitted, in his discretion, to require a broader basis for reputation testimony than a mere affirmative answer to the question, "Do you know the defendant's reputation?" We hold that, in view of the extremely narrow compass of the defendant's business associations and the single occasion upon which the witnesses heard any report of his character expressed, the judge in his discretion was warranted in ruling that there was not a sufficient basis for reputation testimony.

3. The defendant also assigns as error two remarks made by the prosecutor during his closing argument. No objection was made to either remark, nor were any instructions requested to remedy the alleged harm. See *Common-*

*wealth* v. *Cabot,* 241 Mass. 131, 148–151. Nevertheless we consider both remarks.

The first concerned the fact that the defendant did not inform the police at any time of certain important details of the alibi which was presented at the trial. The defendant contends that this remark infringed upon his constitutional right to silence. Assignment No. 11. But the defendant, according to his own testimony upon direct examination, did not remain silent. On the contrary, he testified that he told the police where he had been on the night of August 15, 1965. Under cross-examination, he answered that he had not told the police the same details in regard to that night as were presented at the trial. The remark complained of was not in effect directed at the defendant's silence while under arrest but rather at an inconsistency in his alibi which had been brought out during the trial. There was no error.

The other remark complained of was made near the end of the prosecutor's argument where he said, "Now the spirit of Clifford Sheets is hovering over this court room watching to see how well you redeem your juror's oath, watching how well and courageously you perform your duty as jurors." Assignment No. 10. This was an emotional appeal, which had best been omitted. But in a lengthy criminal trial, some improprieties are almost unavoidable. We are of opinion that this one isolated remark, to which no objection was made at the trial, was not so prejudicial as to call for reversal. See *Commonwealth* v. *Smith,* 342 Mass. 180, 188.

4. There are several other assignments of error. Some have not been argued; others were not argued sufficiently to constitute compliance with Rule 13 of the Rules for the Regulation of Practice before the Full Court (1952), 328 Mass. 698 (*Lolos* v. *Berlin,* 338 Mass. 10, 14), or are so lacking merit as to require no discussion. Nevertheless, in view of the gravity of the offence charged we have considered all of the assignments and have examined the entire transcript and are satisfied that the conviction should stand.

*Judgment affirmed.*